# United States Court of Appeals

## For the First Circuit

_____

No. 00-1617

WILLIAM J. GOSSELIN,

Plaintiff, Appellant,

v.

RAYMOND A. WEBB, ARTHUR C. SULLIVAN, JR., WILLIAM N.
HURLEY AND MARSHALL L. FIELD, d/b/a FIELD, HURLEY, WEBB &
SULLIVAN,

Defendants, Appellees.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, U.S. District Judge]

_____

Before

Selya and Stahl, Circuit Judges,

and Lisi,* District Judge.

_____

Joseph H. Reinhardt with whom Philip Y. Brown, Danielle R.
Menard, Adler, Pollock & Sheehan, P.C., Edwin A. McCabe and The
McCabe Group, P.C. were on brief for appellant.
William N. Hurley for appellees.

_____

March 16, 2001

_____

_____

*Of the District of Rhode Island, sitting by designation.

**LISI, <u>District Judge</u>.**  In this legal malpractice action, Appellant William Gosselin ("Gosselin") seeks to hold Appellees, a group of attorneys who share office space and practice under the "trade name" Field, Hurley, Webb & Sullivan ("Field, Hurley" or the "firm") vicariously liable for the alleged professional misdeeds of attorney James O'Dea ("O'Dea").  The legal contours of O'Dea's relationship with the firm form the subject matter of this appeal.  Gosselin has settled his claims against O'Dea. The district court granted summary judgment in Appellees' favor, <u>Gosselin</u> v. <u>O'Dea</u>, 40 F. Supp. 2d 45 (D. Mass. 1999), and Gosselin appeals from that judgment.  Because we find that there exists a genuine issue of material fact as to whether a partnership by estoppel existed between O'Dea and Appellees, we vacate the judgment below.

## I. Background

In April of 1992, Gosselin, who had been employed as a second mate on a merchant marine freighter, was discharged by his employer, American President Lines, Inc. ("APL"). Gosselin, through his union, filed a grievance to contest the

-2-

discharge.  On August 12, 1992, an arbitrator conducted a hearing on Gosselin's grievance.

The Gosselins met O'Dea, Mrs. Gosselin's cousin, in October or November 1992, while they were attending the funeral of a family member.  O'Dea is an attorney licensed to practice law in Massachusetts and Washington, D.C.  After the funeral, the Gosselins and O'Dea discussed Gosselin's case and Gosselin told O'Dea that because of the termination, Gosselin's financial situation had deteriorated badly and he was facing the loss of his home to a possible foreclosure.  During the conversation, O'Dea told the Gosselins that he was now "with Field, Hurley, Webb & Sullivan in Lowell [Massachusetts]." O'Dea asked Gosselin to let him know the results of the arbitration.

Shortly after this chance meeting between Gosselin and O'Dea, the arbitrator decided Gosselin's case, reinstating Gosselin to his position with APL with certain conditions imposed.  The arbitrator's award, however, did not provide for any payment of back wages.

Before calling O'Dea, and because Gosselin "wanted to make sure that Mr. O'Dea had the backing and support of an established law firm, which could provide him with advice and support," Mrs. Gosselin telephoned her brother, a long-time

resident of Chelmsford, Massachusetts (Chelmsford abuts Lowell) to inquire whether he had ever heard of Field, Hurley.  Mrs. Gosselin's brother responded that Field, Hurley "was a well-respected law firm in Lowell."  Having received this positive report, the Gosselins decided to call O'Dea.

Gosselin contacted O'Dea by phone at his Washington, D.C. office and scheduled an appointment to meet with O'Dea at the Field, Hurley offices on November 24, 1992.  In the foyer of the building, O'Dea's name was listed on the directory under the heading "Field, Hurley, Webb, Sullivan  Attorneys at Law." O'Dea's name was situated beneath the names of Marshall Field, William Hurley and Arthur Sullivan, Jr.  The listing did not indicate that Field, Hurley was not a partnership, nor was there any notation describing O'Dea's relationship with the group or the individual attorneys listed.  On their arrival at the Field, Hurley offices, O'Dea introduced the Gosselins to Arthur Sullivan ("Sullivan") and the four exchanged some pleasantries.  O'Dea and the Gosselins then went to an office within the Field, Hurley suite where they discussed O'Dea's pursuit of claims against APL for back wages and for damages under the Americans with Disabilities Act ("ADA").

Some time prior to January 2, 1993, Gosselin was again discharged by APL.  On that day, Gosselin spoke to O'Dea by

-4-

phone.  The two discussed the lawsuit against APL, and Gosselin agreed to have O'Dea represent him on a contingent fee basis.

During the week of January 13, 1993, at O'Dea's direction, the Gosselins went to the Field, Hurley offices to sign documents necessary for the filing of a petition under Chapter 11 of the United States Bankruptcy Code.  O'Dea had previously prepared the documents in Washington, D.C., but, because the Gosselins were residents of New Hampshire, it was necessary that an attorney licensed in New Hampshire file them.  O'Dea had called Sullivan seeking his recommendation of a New Hampshire attorney to file the documents.  During that conversation, O'Dea asked Sullivan to have the Gosselins come to the Field, Hurley offices to execute the documents.  Sullivan agreed.  When Mrs. Gosselin came to the Field, Hurley offices she first met with Sullivan's secretary who showed her where to sign the documents.  When Mrs. Gosselin indicated to Sullivan's secretary that she had a question regarding the relationship between the filing of the bankruptcy petition and the foreclosure on her home, Sullivan met with her and explained how the bankruptcy filing would stay the foreclosure. Mrs. Gosselin maintains that Sullivan also told her that his office would deliver the documents to the New Hampshire attorney for filing, and that Sullivan knew that O'Dea was

-5-

working on trying to get back wages and looking into the ADA claim.

During the time that O'Dea was representing Gosselin, Gosselin called Field, Hurley and spoke to Sullivan on one occasion. Gosselin also called Field, Hurley and spoke to a secretary on several occasions "[t]o find out what was going on as far as back wages and ADA claim (sic) and also bankruptcy."

In addition to Sullivan's meeting with Mrs. Gosselin, his notes reflect a phone call with Gosselin on December 26, 1992, "for O'Dea." Several other of Sullivan's notes from January 11-15, 1993, indicate that Sullivan received three to four phone calls from O'Dea regarding Gosselin's case.

Throughout the course of his representation of Gosselin, O'Dea used letterhead with only his name on it when he communicated with Gosselin in writing. However, that letterhead did bear the addresses of both O'Dea's Washington, D.C. office and the Field, Hurley office in Lowell.

On August 26 and 27, 1993, O'Dea represented Gosselin at an arbitration hearing to contest the second discharge. At that time, APL made several settlement offers to Gosselin. The final offer was in the amount of $125,000 in exchange for Gosselin's voluntary termination of employment and a general release. O'Dea and Gosselin discussed the offer and the fact

that that sum would not be sufficient to pay all of Gosselin's debts. Gosselin claims that O'Dea advised him to reject the offer "because the A.D.A. suit would be a million dollar law suit." Gosselin rejected the offer.

In November 1993, the arbitrator ruled against Gosselin and in favor of APL. When Gosselin learned that O'Dea had failed to file a timely administrative claim under the ADA and that O'Dea had not filed a claim for back wages, he filed suit against O'Dea and Appellees[1] for legal malpractice in mishandling his claims against APL.

During the pendency of the lawsuit in the district court, Gosselin settled his claim against O'Dea. Field, Hurley, Webb & Sullivan and the individual Appellees filed a motion for summary judgment which the district court granted. Gosselin, 40 F. Supp. 2d at 48. Gosselin appeals from that decision.

## II. Standard of Review

"This Court reviews orders for summary judgment de novo, construing the record in the light most favorable to the

---

[1]The lawsuit originally named Field, Hurley, Webb & Sullivan. The district court, having been apprised that Appellees were not members of an actual partnership, on its own motion amended the complaint to name Appellees individually. No one complains about this action.

nonmovant and resolving all reasonable inferences in that party's favor." Landrau-Romero v. Banco Popular de P.R., 212 F.3d 607, 611 (1st Cir. 2000).[2] If, after such review, we find that "the evidence . . . reveals a genuine dispute over a material fact--that is, if a reasonable factfinder, examining the evidence and drawing all reasonable inferences in the required manner, could resolve a factual controversy which is critical to the outcome of the case in favor of the nonmoving party--then summary judgment will not lie." Serapion v. Martinez, 119 F.3d 982, 987 (1st Cir. 1997).

## III. Partnership By Estoppel

---

[2]At the outset, this court must note Appellees' failure to comply with Rule 56.1 of the Local Rules of the United States District Court for the District of Massachusetts, which requires the moving party to "include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation." D. Mass. Loc. R. 56.1. Rules such as this "were developed by the district courts in this circuit in response to this court's concern that, absent such rules, summary judgment practice could too easily become a game of cat-and-mouse, giving rise to the 'specter of district court judges being unfairly sandbagged by unadvertised factual issues.' Such rules are a distinct improvement--and parties ignore them at their peril." Ruiz Rivera v. Riley, 209 F.3d 24, 28 (1st Cir. 2000) (quoting Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 931 (1st Cir. 1983)). This court proceeds as did the district court, without a conforming statement of fact, and any negative consequences of that omission must be borne by the Appellees.

We begin our review by noting, as did the district court, that the individual Appellees were not in fact partners in a law firm.  They shared office space and certain expenses and practiced under the "trade name Field, Hurley, Webb & Sullivan (collectively "the group")."[3]  Appellees' Brief at 1.  Gosselin, therefore, relies on the doctrine of partnership by estoppel to hold Appellees liable for O'Dea's alleged malpractice.  To prevail under this doctrine, a plaintiff must prove four elements: "(1) that the would-be partner has held himself out as a partner; (2) that such holding out was done by the defendant directly or with his consent; (3) that the plaintiff had knowledge of such holding out; and (4) that the

---

[3]We find this statement troublesome, particularly in the context of this litigation.  Rule 7.5 of the Massachusetts Rules of Professional Conduct warns lawyers against the use of such a "trade name."  Mass. Rules of Prof'l Conduct R. 7.5 (1998).  Rule 7.5(d) provides: "Lawyers may state or imply that they practice in a partnership or other organization only when that is the fact."  <u>Id.</u>  In addition, Comment [2] provides:

> [L]awyers who are not in fact partners, such as those who are only sharing office facilities, may not denominate themselves as, for example, 'Smith and Jones,' or 'Smith and Jones, A Professional Association,' for those titles, in the absence of an effective disclaimer of joint responsibility, <u>suggest partnership in the practice of law</u>.

<u>Id.</u> (emphasis added).

plaintiff relied on the ostensible partnership to his prejudice." Atlas Tack Corp. v. DiMasi, 637 N.E.2d 230, 232 (Mass. App. Ct. 1994) (quoting Brown v. Gerstein, 460 N.E.2d 1043, 1052 (Mass. App. Ct. 1984)). Evidence of "holding out" may consist of "words spoken or written or . . . conduct." Mass. Gen. Laws ch. 108A, § 16(1). Thus, a plaintiff may establish the first two elements of his claim by pointing not only to what the putative partners have said, but also to what they did.[4]

The district court found that the evidence mustered by Gosselin in opposition to the motion for summary judgment was insufficient to ward off "brevis disposition." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). We believe that the district court's assessment missed the mark in two ways. First, the district court seemed to focus on the fact that neither O'Dea nor the Appellees ever "expressly described" O'Dea as a partner in the firm. Gosselin, 40 F. Supp. 2d at 48. In so doing, the district court discounted other facts (both words and conduct) bearing

---

[4]Since the focus of the parties and the district court was limited to the "holding out" elements, we follow suit and confine our review to the evidence presented on O'Dea's and Appellees' words and actions as they relate to those elements of the claim.

on the "holding out" elements.  Secondly, the district court failed to view those facts through a lens properly adjusted in accordance with the jurisprudence regarding Rule 56 of the Federal Rules of Civil Procedure.  See, e.g., Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997); Serapion, 119 F.3d at 987.

The holdings of the Supreme Judicial Court of Massachusetts ("SJC") and the Appeals Court of Massachusetts in a trilogy of decisions define the parameters of the "holding out" elements.  See Standard Oil Co. v. Henderson, 163 N.E. 743 (Mass. 1928); Brown, 460 N.E.2d 1043; Atlas Tack, 637 N.E.2d 230.  After close examination of the facts set forth in those decisions, we conclude that the cases principally relied upon by the district court, Standard Oil and Brown, are factually distinguishable from the case sub judice.  Because the determination as to whether a partnership by estoppel exists necessarily involves a fact-intensive inquiry, we survey the controlling cases in some detail here.

In Standard Oil, 163 N.E. 743, plaintiff sought to hold Thomas Henderson, Sr. ("Henderson, Sr.") liable for the debts of a gas station operated by Thomas Henderson, Jr. ("Henderson, Jr.").  Id. at 744.  Henderson, Jr. put a sign on the window of the station: "Henderson & Son."  Id.  Henderson, Jr. signed an

equipment loan agreement with Standard Oil on behalf of "Henderson & Son." Id. Henderson, Jr. ran the gas station while Henderson, Sr. worked in one of the local mills. Id. At trial, plaintiff presented no direct evidence that Henderson, Sr. knew of or consented to his name being used in "Henderson & Son." Id. The only circumstantial evidence offered on this point was that it might be inferred that Henderson, Sr. knew of the "holding out" because he walked by the gas station almost every day and, therefore, that he saw the sign. Id. Also at issue in Standard Oil, but not relevant to our discussion, was the question of whether plaintiff had established the element of reliance. Id. at 745. The SJC held that "[t]he evidence presented an issue of fact, and did not warrant the requested ruling of law that the defendant was a partner by estoppel in the business carried on under the style of 'Henderson & Son.'" Id.

In Brown, 460 N.E.2d 1043, Brown argued that Weiner, who practiced law with Gerstein, although not as actual partners, should be held vicariously liable for Gerstein's malpractice. After a jury trial, the trial judge granted Weiner's motion for judgment notwithstanding the verdict on the grounds that the evidence was insufficient to establish the second element of partnership by estoppel, i.e., that any holding out was done

-12-

directly by Weiner or with his consent.  460 N.E.2d at 1046.
In deciding whether the trial judge properly entered judgment
in favor of Weiner, the court applied the standard applicable
to a motion for directed verdict, i.e., whether "anywhere in
the evidence, from whatever source derived, any combination of
circumstances could be found from which a reasonable inference
could be drawn in favor of the plaintiff."  Id.  The appeals
court affirmed, finding that "plaintiffs' proof on consent came
down to Weiner's knowledge that his name was being used on the
office stationery."  Id. at 1053.  Citing to Standard Oil, the
court held that "the use of a person's name in a business, even
with that person's knowledge, is too slender a thread to
warrant a favorable finding on the consent element."  Id.  The
court found it "of significance" that the plaintiffs' retainer
check was made payable to Gerstein alone.  Id. at 1052-53.  The
court also noted that "[t]here was no evidence that the
plaintiffs ever met Weiner or that Weiner rendered any legal
services on their behalf."  Id. at 1052.

In Atlas Tack, 637 N.E.2d 230, the court ruled that
summary judgment should not have been granted where plaintiff
sought to recover damages from two attorneys who shared office
space with a third attorney whose alleged malpractice prompted
the lawsuit.  The court focused on the evidence of "holding

out": the defendants knew of and consented to the third attorney (Donabed) using letterhead that bore the legend "Law Offices of DiMasi, Donabed & Karll, A Professional Association." Id. at 232-33. In addition, Donabed used stationery with this letterhead for bills for legal services rendered to plaintiff. Id. at 233. Those bills, however, did not indicate whether payment should have been made to Donabed, or that the bill was submitted by Donabed and not DiMasi, Donabed and Karll. Id. The court, relying on an ethics opinion from the Massachusetts Bar Association Committee on Professional Ethics, found that "the use of the term 'professional association' may well suggest a partnership to the public which is unlikely to distinguish among partnerships, professional corporations, and professional associations." Id. at 233 (citing Mass. Bar Ass'n Comm'n on Prof'l Ethics, Op. 85-2 (1985)). The court held that "[a]t the very least, the use of the term in the circumstances of this case presents a question of fact as to whether a partnership by estoppel exists." Id. at 233.

We cull several guiding principles from these cases. First, "[o]rdinarily, whether a partnership by estoppel exists is a question of fact." Atlas Tack, 637 N.E.2d at 232. Second, if the only evidence of "holding out" consists of the

-14-

use of a person's name in a business, even with that person's knowledge, the putative partner may escape liability as a matter of law. Brown, 460 N.E.2d at 1053; Standard Oil, 163 N.E. 743. Finally, where, as here, there is significant evidence bearing on the "holding out" elements beyond mere use of the putative partner's name, summary judgment will not lie. Atlas Tack, 637 N.E.2d at 233; Brown, 460 N.E.2d 1043.

Against this backdrop of controlling case law, we revisit the facts offered up by Gosselin. First, O'Dea told the Gosselins he was "with" Field, Hurley. While the term "with" may be ambiguous as the district court found, when viewed in the light most favorable to the Gosselins, it, along with the other evidence of "holding out" may convey to a reasonable factfinder that O'Dea shared equal standing with the other attorneys who make up the "firm" Field, Hurley. Second, there is the lobby directory: "Field, Hurley, Webb, Sullivan Attorneys at Law" with O'Dea's name listed under the individual Appellees' names. Such a listing implies a "partnership-like arrangement." Mass. Bar Ass'n Comm'n on Prof'l Ethics, Op. 85-2; see also Atlas Tack, 637 N.E.2d at 233. The directory listing utilized by Appellees contains no disclaimer of partnership, nor does it include any limiting description of O'Dea's actual relationship to the other "Attorneys at Law"

-15-

listed.  Third, O'Dea arranged to meet with Gosselin at the Field, Hurley offices and arranged for the Gosselins to go there to sign bankruptcy papers at a time when he would not be there, all of which may be taken to imply that he had the authority to use the Field, Hurley offices as an equal member of the "firm."  Fourth, on at least one occasion, Gosselin called Field, Hurley and spoke with Sullivan, and on several other occasions, Gosselin called Field, Hurley and spoke with a secretary there "[t]o find out what was going on as far as back wages and ADA claim (sic) and also bankruptcy."  Fifth, in January 1993, Sullivan agreed to assist with the execution of the Gosselins' bankruptcy petition and accommodated O'Dea's request that the Gosselins come to the Field, Hurley offices to sign papers.  Sullivan later met with Mrs. Gosselin and advised her regarding the bankruptcy filing, and acknowledged that he knew that O'Dea was working on Mr. Gosselin's claims for back wages and damages under the ADA.

We have now come full circle.  The record before us reveals many facts, some contested and others undisputed, bearing on two elements of proof crucial to Plaintiff's claims. We find that "the evidence . . . reveals a genuine dispute over a material fact" such that a reasonable factfinder could resolve the factual controversy as to whether O'Dea was held

-16-

out as a partner of Appellees in favor of Gosselin.  <u>Serapion</u>, 119 F.3d at 987.

Accordingly, we vacate the judgment below and remand for further proceedings consistent with this opinion.